LUCY R. TWIST v. WARREN BABCOCK, SR., CATHARINE B. JONES, GEO. W. BABCOCK ET AL.

*Vacation of transfer in nature of bequest—Right of heir to know how estate is disposed of—Costs.*

A transfer of personalty in the nature of a bequest cannot be set aside merely because it shows an unnatural disposition on the donor's part and is wrong in morals, so long as there is no evidence that it was brought about by fraud or undue influence and that the grantor was of a sufficiently sound mind to dispose of his property.

An heir at law has a right to know what disposition has been made of the estate, and is justified in filing a bill to set aside deeds and trans-fers made by the ancestor where there is good reason to believe that they were procured by fraud or undue influence or that he was men-tally incompetent; especially where the deeds have been kept inten-tionally from complainant's inspection.

Costs of the trial court may be granted complainant even while denying relief in a proceeding to set aside transfers which defendant's conduct had given good reason to think had been fraudulently procured.

Appeal from Washtenaw. Submitted June 7. Decided June 14.

Bill to set aside deeds of land and transfers of personalty. Complainant and defendant Warren Babcock, Sr., appeal. Reversed; bill dismissed.

*Albert Crane* for complainant.

*J. Willard Babbitt* and *Cutcheon & Stellwagen* for defendants.

Campbell, J. The bill in this case was filed by a daughter of David Babcock, deceased, to set aside certain conveyances of land made by her father shortly before his death, and certain transfers of personal assets made at or about the same time, whereby all of his estate was transferred to his two sons George W. Babcock and Warren Babcock, and to their children. Most of the land went to the sons for life, with remainder to the children. Some was disposed of immediately.

These dealings are attacked on the grounds of mental incompetency, and of fraud and undue influence.

If there was no fraud or undue pressure, we do not think the ground of incompetency made out. The testimony shows a very peculiar character, with striking faults and some weaknesses, but we do not think Mr. Babcock is shown to have been incompetent at any time to deal with his property, and there are no witnesses familiar with him who give us reason to doubt his capacity, if let alone, to dispose of his property by will or otherwise.

The question of undue influence is more serious, and the court below held the transfers of personalty, but not those of realty, void on this account. We do not see any reason for this discrimination, and are of opinion that they were essentially parts of one transaction which must stand or fall ogether.

We do not think it necessary to refer to facts except far enough to explain our conclusions.

Mr. Babcock died in December, 1878, at the house of his son Warren, in Kent county, being about 80 years old. He had been taken out there from Ypsilanti during the summer or early fall. The reason for having him removed was his evidently failing strength, and the difficulty of getting him properly looked after in Ypsilanti. It appears very clearly that this removal was not the result of any family scheme, but suggested by outside neighbors who took an interest in having him attended to.

For several months previous to this removal he had lived in a somewhat miserly and irregular way, having rooms at different places and sometimes preparing a part of his food himself. He had quarrelled alternately at different periods with all of his children, and had in like manner become reconciled perfectly or imperfectly with them. His son George lived in another State and had not been in Michigan for some time. His son Warren lived in Lowell, Kent county. His daughter, Mrs. Twist, lived in Washtenaw, and he had once lived with her, but he had recently quarrelled with her and her husband on account of her obtaining the property of her bachelor brother that he appears to have expected himself and claimed as his own. All of these children had children of their own, grown or growing up to maturity. He does not appear to have had anything which could properly be called affection for any of his descendants, although he appears to have felt more of it towards his grandchildren than his children. He was a man of fair intelligence, and a good deal of business capacity, but very obstinate and intolerant of opposition. He showed signs of folly and eccentricity in some of his conduct, but it is the opinion of nearly all the more intelligent witnesses that while he was always unpleasant and hard-headed, he never lost his sanity.

It is made clear by the proofs that during the year 1878, and probably before, he had expressed the intention of providing chiefly for his grandchildren, not having apparently

much confidence in the prudence of their parents. He had
felt very bitterly towards his son-in-law, Mr. Twist, and
while there is some conflict concerning his intentions towards
his daughter and her children, we think the testimony pre-
dominates against his having overcome his harsh views.

During this year it is plain that he was seriously consid-
ering the disposal of his estate, and he made or attempted
several different wills.    In the fall of 1877, before the quar-
rel, he dictated a will of personalty in which all the Michi-
gan grandchildren were to participate, as well as George
Babcock.    This will was not completed because he was
unable to determine what disposition to make of a portion
of his lands.    In June, 1878, he executed a will disposing
of all his property, and expressly disinheriting Mrs. Twist,
while providing for all of the other families.    This was
done before he went to Lowell, and was, so far as we can
judge, his own uninfluenced act.    The subsequent disposi-
tions differed in some respects as to shares and interests, but
followed the same general purpose.

His disposition was such as would render him quite liable
to influence if cunningly exerted, and there is a good deal of
testimony which would indicate that Warren Babcock had
no personal affection for his father, and had selfish inclina-
tions and a desire to profit by the circumstances.    His let-
ters show this scheming disposition, and the testimony
indicates that he did more or less to keep alive the old
man's jealousy of the Twists.    But it also indicates that he
never obtained any considerable influence over his father,
and was obliged to get his brother George to suggest a
transaction which nevertheless, while two of his children
were benefited by it, was of no special advantage to himself,
as finally consummated.

The final arrangements were made when the deceased had
the aid of competent counsel, and all the testimony indicates
that there was no interference with him.    It also shows that
he knew then and subsequently what he was doing, and
approved it.

If the family of his daughter, Mrs. Twist, had been pro-

vided for like the rest, there is nothing in these transactions which would be open to criticism as unwise or singular. There is no reason to suppose, if he changed his will of June, 1878, he would have changed it in her favor. While his feelings were to any ordinary mind unnatural and despicable, they were not disturbed by insanity, and his acts cannot be held void merely because they were wrong in morals. We are compelled somewhat unwillingly to uphold them as legally valid.

The result must be the modification of the decree and its reversal so far as it avoided the transfers of personalty.

Upon the question of costs we have a discretion which we feel bound to exercise. We think Mrs. Twist was perfectly justified in bringing this suit. The deeds involved in this litigation were not recorded until after the original bill was filed in this cause, and they were intentionally kept from the inspection of Mrs. Twist. She had a right as heir at law to know what disposition had been made of the estate, and such concealment fully justified her in supposing it was meant to carry out a fraud. There was also great cruelty, to use no stronger term, in the concealment of her father's sickness and death and the heartless manner of providing for his burial. While there is sometimes difficulty in giving costs to a defeated party, we think under such circumstances no costs should be given against her and that she should recover costs below against Warren Babcock.

The decree must be reversed and the bill dismissed, with the further order that all parties pay their own costs in this Court, and that complainant recover her costs below from Warren Babcock, senior.

GRAVES, C. J. and COOLEY, J. concurred.